422 A.2d 563

**URBAN REDEVELOPMENT AUTHORITY OF PITTSBURGH**

v.

**NORALCO CORPORATION, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 16, 1979.

Filed Oct. 3, 1980.

Petition for Allowance of Appeal Denied March 13, 1981.

W. Arch Irvin, Jr., Pittsburgh, for appellant.

Richard D. Klaber, Pittsburgh, for appellee.

Before CERCONE, President Judge, and PRICE, SPAETH, HESTER, CAVANAUGH, MONTGOMERY and HOFFMAN, JJ.

HOFFMAN, Judge:

Appellant contends that the lower court erred in concluding that the parties' contract required appellant to indemnify appellee for a loss resulting from appellee's negligence. We disagree and, accordingly, affirm the entry of judgment n. o. v. in favor of appellee.

Appellee, Urban Redevelopment Authority of Pittsburgh (URA), owns a tract of land in the East Liberty section of Pittsburgh. Appellant, Noralco Corporation (Noralco), is engaged in demolition work. In 1965, the URA and Noralco entered into a contract whereby Noralco agreed to perform demolition and site clearance work at the East Liberty site. The contract stated that the URA assumed no responsibility for the condition of existing buildings and other structures. Additionally, the contract obligated Noralco, *inter alia*, to inspect the premises to acquaint itself with the existing conditions; to provide supervision, technical personnel, labor, and materials; to ask the URA for any additional information which might be needed in planning and performing the work; and to demolish structures in such a manner as to avoid hazards to persons and property. The contract further provided that Noralco "shall exercise proper precautions of persons and property and shall be responsible for all damages to persons or property, either on or off the site, which occur as a result of [its] fault or negligence in connection with the prosecution of the work." Another contract provision required Noralco to "indemnify and save harmless the [URA] from any claims for damages resulting from personal injury and/or death suffered or alleged to have been suffered by any person as a result of any work conducted under this contract."

On August 1, 1968, while Noralco's employees were tearing down a brick wall at the site, the wall collapsed and fell upon one of the employees, resulting in his death. The

decedent's estate brought an action against the URA and recovered damages in the amount of $172,300.00. The URA then instituted this indemnity action against Noralco.[1] The evidence at trial established that although the URA had inspectors at the East Liberty site to enforce compliance with the contract, Noralco had sole control and possession of the premises at the time of the accident. Additionally, the evidence revealed that the Noralco employees believed that the brick wall which they were tearing down at the time of the accident was "tied in" to the wall of an adjoining building. In fact, however, the walls were separate. Consequently, while the employees were removing bricks from the unsupported wall, it collapsed. After the accident, Noralco found plans in an elevator tower on the roof of the adjoining building which showed that the two walls were not connected. Before the accident, however, neither the URA nor Noralco knew that these plans existed or that the walls were separate. The trial court instructed the jury that the URA was entitled to be indemnified by Noralco pursuant to their contract if the URA was free from active negligence and if Noralco did anything which caused the death of the employee. The jury returned a verdict in favor of Noralco. In granting judgment n. o. v. for the URA, the lower court concluded that there was no evidence that the URA was actively negligent and that the parties' contract required Noralco to indemnify the URA for damages resulting from personal injuries caused by the URA's passive negligence. This appeal followed.[2]

The question of whether an indemnity contract requires a contractor to indemnify an owner against the latter's own

1. The URA sought recovery on two alternative theories: common law indemnity and contractual indemnity. The URA has not challenged the propriety of the jury's finding that it was not entitled to common law indemnity.

2. A panel of this Court, in an unpublished opinion, held that the URA was actively negligent and that the contract did not require Noralco to indemnify the URA under the circumstances of this case. Accordingly, the panel reversed the judgment and reinstated the jury verdict. Our Court subsequently granted the URA's petition for reargument.

negligence was first considered by our Supreme Court in *Perry v. Payne*, 217 Pa. 252, 66 A. 553 (1907). The contract in that case provided that the contractors were to indemnify the owner "from all loss, cost or expense . . . arising from accidents to mechanics or laborers employed in the construction of said work, or to persons passing where the work is being constructed." An employee of a subcontractor was killed when he was struck by an elevator negligently operated by an employee of the owner. At the time of the accident, the owner was in exclusive control of the elevator. The owner brought an indemnity action against the contractors after paying a judgment obtained by the decedent employee's estate. Our Supreme Court considered the surrounding circumstances and the parties' purposes in making the contract and concluded that the parties intended the contractors to indemnify the owner from losses caused by the negligence of the contractors or their employees while performing the construction contract, and the parties did not anticipate imposing liability on the contractors for the negligence of the owner or his employees. The Court stated that if the contractors had to indemnify the owner in this case, they would be insurers, and the extent of their liability would be uncertain, indefinite, and entirely controlled by the owner. Moreover, the Court believed that the profits to be realized by the contractors were inadequate when compared to liability of such unlimited extent.[3] After reviewing cases

3. Some courts have concluded that this aspect of *Perry* is no longer valid. *See, e. g., Spurr v. Acme Steel Co.*, 238 F.Supp. 606, 610 (N.D.Ill.1964) ("In *Perry v. Payne*, supra, the court based its opinion, in part, upon a feeling that one party would not undertake a very large indemnity upon a very small job; but today, in reality, the indemnity agreements do not shift the loss, but shift the burden of paying for and procuring insurance."); *Cozzi v. Owens Corning Fiber Glass Corp.*, 63 N.J.Super. 117, 125, 164 A.2d 69, 74 (App.Div.1960) ("We may take judicial notice of modern business conditions which make the rationale no longer pertinent. Today the risk of injury may be shifted to an insurance company, and commonly is.") *See also Westinghouse Electric Co. v. Murphy, Inc.*, 425 Pa. 166, 173 n.5, 228 A.2d 656, 660 n.5 (1967) ("It would appear that . . . contracts [indemnifying one against his own negligence] are useful to parties involved in construction and similar activities as a means of allocating the

in other jurisdictions which had considered the issue, the Court stated:

> We think it clear, on reason and authority, that a contract of indemnity against personal injuries should not be construed to indemnify against the negligence of the indemnitee, unless it is so expressed in unequivocal terms. The liability on such indemnity is so hazardous, and the character of the indemnity so unusual and extraordinary, that there can be no presumption that the indemnitor intended to assume the responsibility unless the contract puts it beyond doubt by express stipulation. No inference from words of general import can establish it. The manifest purpose, in such cases, to indemnify against the injury which, under the circumstances, could reasonably be apprehended only from the action of the indemnitor, or his servant, is a weighty consideration in construing indemnity contracts. The circumstances surrounding the parties, the one, the owner for whom the building is to be erected, and the other, the contractor who is to construct the building and hence from whose acts injuries to persons and property may be anticipated, would seem to make the conclusion irresistible, that unless expressly stipulated in the contract the owner is not to be indemnified against his own negligence. In the case at hand the parties have not expressly stipulated against injury occasioned by the indemnitee's own negligence, and we are satisfied, from the terms of the instrument read in light of the circumstances surrounding the parties as well as the manifest purpose inducing the bond, that they did not intend to protect the indemnitee against his own or his servant's negligence.

*Id.* 217 Pa. at 262–63, 66 A. at 556–57.

In *Pittsburgh Steel Co. v. Patterson–Emerson–Comstock, Inc.*, 404 Pa. 53, 171 A.2d 185 (1961), the contractor agreed to "indemnify, save harmless and defend [the owner] from all liability for loss, damage or injury to person or property in any manner arising out of or incident to performance of this

responsibility for obtaining insurance. . . ." (citing *Spurr v. Acme Steel Co., supra*)).

order ...." The contractor in that case had agreed to install a mill on the owner's premises. An employee of a subcontractor was severely injured as a result of the negligent operation of a crane by an employee of the owner.[4] After settling the injured employee's claim, the owner sought indemnification from the contractor. Our Supreme Court stated that "the law is well settled that the intention to include within the scope of an indemnification contract, a loss due to the indemnitee's own negligence, must be expressed in clear and unequivocal language." *Id.*, 404 Pa. at 57, 171 A.2d at 187. The Court noted, however, that if the language of the indemnity contract is not explicit, our courts will consider the surrounding circumstances and the parties' object in making the contract. After observing that the facts of this case were almost identical to those in *Perry v. Payne, supra,* the Court concluded that although the indemnity provision was expressed in broad general terms, it did not contain clearly expressed or unequivocal language to show that the parties intended to indemnify the owner from its own negligence. Additionally, the Court found that the surrounding circumstances did not establish such an intent. Compare *Westinghouse Electric Co. v. Murphy, Inc.,* 425 Pa. 166, 228 A.2d 656 (1967) (contract held to require contractor to indemnify owner from owner's negligence where contract provided that contractor would indemnify owner from all claims arising out of personal injuries or death to owner or its employees, "whether the same results from negligence of [owner] or [owner's] employees or otherwise, it being the intent of this provision to absolve and protect [owner] from any and all loss by reason of the premises."). *See also Babcock & Wilcox Co. v. Fischbach & Moore, Inc.,* 218 Pa.Super. 324, 280 A.2d 582 (1971).

In the instant case, Noralco contends that because the indemnification provision herein is similar to those in *Perry* and *Pittsburgh Steel Co.,* it was not required to indemnify

4. The jury found also that the contractor and subcontractor were negligent in failing to employ safety precautions which had been agreed upon, and that the owner was negligent in failing to enforce those safety provisions.

the URA. The URA responds that the rule announced in *Perry* does not apply where the indemnitee was not in possession of the premises at the time of the accident and was only passively negligent. In determining whether the *Perry* rule applies to this case, we shall first consider whether the URA was actively or passively negligent.

In *Potter Title and Trust Co. v. Young*, 367 Pa. 239, 80 A.2d 76 (1951), our Supreme Court stated:

Generally speaking, the term "passive negligence" denotes negligence which permits defects, obstacles or pitfalls to exist upon the premises, in other words, negligence which causes dangers arising from the physical condition of the land itself. "Active negligence", on the other hand, is negligence occurring in connection with activities conducted on the premises, as, for example, negligence in the operation of machinery or of moving vehicles whereby a person lawfully upon the premises is injured.

*Id.*, 367 Pa. at 242–43, 80 A.2d at 78–79. *See also Kopp v. R. S. Noonan, Inc.*, 385 Pa. 460, 123 A.2d 429 (1956); *Komlo v. Balazick*, 169 Pa.Super. 296, 82 A.2d 706 (1951).

 Although the lower court gave instructions on active negligence, the jury's general verdict for Noralco does not reveal whether or not the jury found the URA to be actively negligent.[5] We agree with the lower court, however, that there was no evidence that the URA was actively negligent. The transcript of the trial in which the URA was found to have negligently caused the death of Noralco's employee was not introduced at the trial in this case. Thus, in determining whether there was evidence from which the jury could conclude that the URA was actively negligent, we can consider only the evidence introduced in this case. At the time of the accident, no agent of the URA did any affirmative act which contributed to the collapse of the wall. As noted by the lower court, the URA's negligence, at most, consisted of failing to warn Noralco's employees of a dangerous condition on the premises which the URA, as owner,

5. The URA concedes that the jury found that Noralco was neither actively nor passively negligent.

should have discovered. *See, e. g., Grace v. Henry Disston & Sons, Inc.*, 369 Pa. 265, 268, 85 A.2d 118, 119 (1952) (duty of owner of building to employees of independent contractor). Such negligence is clearly no more than passive.

■ In arguing that the rule announced in *Perry* does not apply where the indemnitee was passively negligent and not in possession of the premises at the time of the accident, the URA misapprehends the scope of that rule. Under *Perry* and its progeny, the parties' intent to have their indemnity contract apply to a loss caused by the indemnitee's own negligence must be expressed in clear and unequivocal language. In applying this rule, however, the courts do not examine only the four corners of the contract to determine whether it specifies losses caused by the indemnitee's negligence.[6] If the contractual language is not explicit, the court will consider the surrounding circumstances and the parties' object in entering into the contract. *See e. g., Brotherton Construction Co. v. Patterson–Emerson–Comstock, Inc.*, 406 Pa. 400, 178 A.2d 696 (1962), *aff'g* 23 Pa.D. & C.2d 783 (Chester County 1961); *Pittsburgh Steel Co. v. Patterson–Emerson–Comstock, Inc., supra; Tidewater Field Warehouses, Inc. v. Whitaker Co.*, 370 Pa. 538, 88 A.2d 796 (1952); *Perry v. Payne, supra.* Thus, in the *Perry* and *Pittsburgh Steel Co.* cases, the Supreme Court reviewed the surrounding circumstances and objectives of the parties and concluded that despite the broad language of the indemnity provisions, the parties did not intend the contractors to indemnify

6. In a case involving an exculpatory provision, our Court held that a contract releasing the lessor "from any liability" precluded the lessee from recovering damages for injuries allegedly resulting from the lessor's negligence. *Zimmer v. Mitchell and Ness*, 253 Pa.Super. 474, 385 A.2d 437 (1978). Our Court stated: "Although we must construe the contract strictly, we must also use common sense in interpreting this agreement. The mere fact that the word 'negligence' does not appear in the agreement is not fatal . . . ." *Id.*, 253 Pa.Super. at 479, 385 A.2d at 439. In *Dilks v. Flohr Chevrolet*, 411 Pa. 425, 192 A.2d 682 (1962), the Supreme Court stated: "While an exculpatory clause . . . differs somewhat from an indemnity clause . . . there is such a substantial kinship between both types of contracts as to render decisions dealing with indemnity clauses applicable to decisions dealing with exculpatory clauses, and vice versa." *Id.*, 411 Pa. at 435 n.11, 192 A.2d at 687 n.11.

the owners from losses resulting from the owners' active negligence. In *Tidewater Field Warehouses, Inc. v. Whitaker Co., supra,* our Supreme Court considered the fact that the indemnitor had complete control and possession of the premises at the time of the accident in concluding that the parties did not intend the indemnity provision, which was similar to those in *Perry* and *Pittsburgh Steel Co.,* to protect the indemnitee from losses resulting from the indemnitee's negligence. Courts in other jurisdictions have viewed as a relevant circumstance in determining the parties' intent the fact that the indemnitee's negligence was passive. *See, e. g., American Oil Co. v. Hart,* 356 F.2d 657 (5th Cir. 1966) (applying Florida law); *Harvey Machine Co. v. Hatzel & Buehler, Inc.,* 54 Cal.2d 445, 353 P.2d 924, 6 Cal.Rptr. 284 (1960); *Bartlett v. Davis Corp.,* 219 Kan. 148, 547 P.2d 800 (1976); *Stern v. Larocca,* 49 N.J.Super. 496, 140 A.2d 403 (App.Div.1958).

In *Stern v. Larocca, supra,* the contractors and owners entered into a contract to convert the owners' building into a garage. The contract stated that "[t]he Contractor[s] shall bear all loss or damage from accidents which may occur to any person or persons, by or on account of the prosecution of the work, until possession is taken by the owner[s]." While performing the contract, an employee of the contractors was injured when part of the ceiling fell upon him. In an action instituted by the employee, the owners had been found to have been negligent because they had actual or constructive notice of a defect in the ceiling. After settling the employee's claim, the owners sought indemnification pursuant to their contract. The New Jersey Superior Court noted that in construing an indemnity contract, courts generally have given great weight to the question of whether the contractor had exclusive possession of the place or instrumentality producing the accident. Additionally, the Court stated that courts have acknowledged that to deny recovery in every case in which the owner's negligence in any way contributed to the loss would leave practically no circumstance in which

the indemnity provision would operate. In holding that the surrounding circumstances in this case showed that the indemnity contract was intended to indemnify the owners from their passive negligence, the Court stated:

The owners had nothing to do with the actual process of the work of alteration under the contract. . . . [T]he contract contemplated that the contractors were to completely familiarize themselves with the building before doing the work. It was further provided therein that they were to do the job in entirety, including "all minor details necessary." In providing in the agreement that the contractors were to "bear all loss or damage from accidents which may occur to any person or persons, by or on account of the prosecution of the work until possession is taken by the owner," the parties must be taken to have in mind what experience and litigation in this field teach would be the most likely occasion for such a claim, an accident to an employee of the contractors during the work. Moreover, since the Workmen's Compensation Act . . . would preclude a common law action by such an employee against the contractors, an action of the kind here brought against the owners by the employee was one of the contingencies clearly to have been contemplated by the parties in drawing the agreement. We deem it to have plainly been the intent of the parties that the absent owner should be entirely relieved of any concern over a claim arising out of such accident, no matter whose fault it was, so long as it arose out of the doing of the work. Presumably the contractors were willing to take their chances with respect to any defective condition of the structure, relying either upon advance inspection and precautions in doing the work or the availability of insurance to cover the risk.

49 N.J.Super. at 506, 140 A.2d at 409. The Court added, however, that if the employee had been injured as a result of the active negligence of an agent of the owners, it would have held the indemnity provision inapplicable because loss

from such a contingency was not within the contemplation of the parties.

In *Harvey Machine Co. v. Hatzel & Buehler, Inc., supra,* the Supreme Court of California distinguished a prior decision which had held that a general indemnity provision did not indemnify the owner for a loss resulting from the owner's negligence as follows:

Here the indemnitee did not continue to maintain independent operations on the premises whereon construction was in progress. The injuries did not result from some conduct or omission unrelated to the indemnitors' performance. Most significantly of all, the claimed breach of duty on the indemnitee's part was not active, affirmative misconduct, but at most passive negligence–a failure to act in fulfillment of a duty of care which devolved upon the indemnitee as the owner or occupier of land. Finally, the misconduct does not relate to some matter over which the indemnitee exercised exclusive control.

54 Cal.2d at 448, 353 P.2d at 926, 6 Cal.Rptr. at 286–87. *See also Bartlett v. Davis Corp., supra,* 219 Kan. at 156, 547 P.2d at 808 ("Where the indemnitor has possession and control of the work or premises and the owner does not maintain independent operations on the premises, a contract of indemnity is generally construed to cover passive negligence of the owner."). *See generally* Annot., 27 A.L.R.3d 663 (1969).

■ We conclude that the surrounding circumstances in this case manifest the parties' intention that the URA be indemnified for losses resulting from its passive negligence. As in the cases above cited, the contractor herein, Noralco, had exclusive control and possession of the premises at the time of the accident and the owner, the URA, was merely passively negligent. Moreover, a review of the provisions of the contract other than the general indemnity provision support our conclusion. The contract stated that the URA was not responsible for the condition of existing buildings and other structures. Additionally, Noralco agreed to inspect the premises in order to acquaint itself with existing

conditions, to request the URA to furnish any information it might need in planning and performing the work, and to perform the contract in such a manner as to avoid hazards to persons and property. The contract also provided that Noralco was responsible for all damages to persons or property resulting from its negligence in connection with the performance of the contract.[7] Considering the language of contract and all of the surrounding circumstances, we conclude that the parties intended Noralco to indemnify the URA for a loss arising from personal injuries sustained by an employee of Noralco while performing the contract, at least in the absence of active negligence by the URA. Accordingly, we hold that the lower court correctly granted judgment n. o. v. in favor of the URA.[8]

Judgment affirmed.

SPAETH, J., files a concurring opinion.

MONTGOMERY, J., concurs in the result.

7. On this appeal Noralco has not challenged the lower court's statement in its opinion that Noralco received fair consideration for its agreement to indemnify the URA. *See* note 3 *supra* and accompanying text. Compare *American Oil Co. v. Hart*, 356 F.2d 657 (5th Cir. 1966) (broad language of indemnity provision did not require contractor to indemnify owner for loss caused by passive negligence of owner where contract price was only $40.45).

8. The Pennsylvania Workmen's Compensation Act provides:
In the event injury or death to an employe is caused by a third party, then such employe, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to receive damages by reason thereof, may bring their action at law against such third party, but the employer, his insurance carrier, their servants and agents, employes, representatives acting on their behalf or at their request shall not be liable to a third party for damages, contribution or indemnity in any action at law, or otherwise, unless liability for such damages, contribution or indemnity *shall be expressly provided for* in a written contract entered into by the party alleged to be liable prior to the date of the occurrence which gave rise to the action.
Act of Dec. 5, 1974, P.L. 782, No. 263, § 6:77 P.S. § 481(b) (Supp.) (emphasis added). This provision went into effect on February 3, 1975. Because the contract in this case was entered into in 1965, we do not decide the applicability of this provision to this case.

SPAETH, Judge, concurring:

I concur in the result reached by the majority, but I regret the majority's reference to "active" and "passive" negligence for several reasons: Use of the terms has been discredited, and they are in any case irrelevant to the issues raised on this appeal; the majority does not make plain what it means by the terms; and finally, this case is better decided without resort to them.

–1–

Offhand, one can think of three lines of cases where the terms "active" and "passive" have been employed to distinguish between types of negligent conduct. None of these lines, however, supports use of the terms here.

First, the terms "active" and "passive" are frequently found in older cases addressing the issue of whether an actor is relieved from the consequences of his negligent conduct by a superseding cause. *See, e. g., Cotter v. Bell*, 417 Pa. 560, 208 A.2d 216 (1965); *DeLuca v. Manchester Laundry and Dry Cleaning Co. Inc.*, 380 Pa. 484, 112 A.2d 372 (1955). However, in *Estate of Flickinger v. Ritsky*, 452 Pa. 69, 305 A.2d 40 (1973), the Supreme Court disapproved the use of the terms "active" and "passive" negligence in this context. For cases following *Estate of Flickinger, see Bacsick v. Barnes*, 234 Pa.Super. 616, 341 A.2d 157 (1975); *Noon v. Knavel*, 234 Pa.Super. 198, 215, 339 A.2d 545, 554 (1975) (PRICE, J., concurring); *Scheel v. Tremblay*, 226 Pa.Super. 45, 312 A.2d 45 (1973). *And see Grainy v. Campbell*, 269 Pa.Super. 225, 242 n.12, 409 A.2d 860, 869 n. 12 (1979) (HOFFMAN, J., dissenting).

Second, as the majority notes, the terms "active" and "passive" negligence are used in several older cases to define the duty owed by a possessor of land to a "gratuitous licensee." *See, e. g., Potter Title & Trust Co. v. Young*, 367 Pa. 239, 242–43, 80 A.2d 76 (1951). However, the duty has been more clearly defined without reference to the terms.

*See* Restatement (Second) of Torts §§ 333–350 (1965) (distinguishing between the duty of a possessor of land towards others for risks arising from dangerous conditions on the land and the duty owed for risks arising from dangerous activities conducted on the land).[1]

Third, the terms "active" and "passive" sometimes appear in cases involving common law indemnity. *See, e. g., Burbage v. Boiler Eng. & Supp. Co., Inc.*, 433 Pa. 319, 326–27, 249 A.2d 563, 567 (1969); *Eazor Express, Inc. v. Barkley*, 441 Pa. 429, 272 A.2d 893 (1971).

If one overlooks the fact that the use of the terms "active" and "passive" negligence has been discredited in discussions of superseding cause and the duty owed by a possessor of land, and if one assumes that the use of the terms retains some validity in cases involving common law indemnity, *but see* Restatement (Second) of Torts § 886B, Comment C (1979), still, we should not resort to them here. Since the Redevelopment Authority does not contest that its negligent conduct was a substantial factor in causing the workman's death, no question of superseding cause exists. In addition, Noralco's workman was not a gratuitous licensee. Finally, this appeal does not involve common law indemnity. *See* footnote 1 of the Majority opinion. The Redevelopment Authority does not challenge the jury's finding that Noralco was innocent of negligent conduct that contributed to the death of its workman. *See* the Authority's Brief at 10. Further, it was established at a prior trial that the Authority was guilty of negligent conduct that caused the workman's death, and the Authority has not attempted to refute these facts in the present proceedings. Since the Authority's negligent conduct was the sole legal cause of the workman's death, its liability was necessarily primary, not secondary, and the principles of common law indemnity are therefore irrelevant.

1. The Restatement has also abandoned the term "gratuitous licensee." Restatement (Second) of Torts § 331.

–2–

By failing to recognize the various definitions that have been given the terms "active" and "passive" in the several lines of cases mentioned above, the majority leaves one uncertain regarding what it means by the terms.

The majority first cites *Potter Title & Trust Co. v. Young, supra,* for the proposition that "passive" negligence is "negligence which permits defects, obstacles or pitfalls to exist upon the premises, in other words, negligence which causes dangers arising from the physical condition of the land itself." Majority op. at 433 Pa. 326–327, 249 A.2d 567. Later, the majority cites cases from other jurisdictions that "have viewed as a relevant circumstance in determining the parties' intent the fact that the indemnitee's negligence was passive." Majority op. at 433 Pa. 326–327, 249 A.2d 567. However, the Annotation cited on pages 568-569 of the majority opinion, which collects most of the cases discussed by the majority for this proposition, uses "passive negligence" as the synonym of "secondary negligence," and "active negligence" as the synonym of "primary negligence." *See Annot.,* 27 A.L.R.3d 663, §§ 2, 11, 12, 13, 14, 15 (1969). Indeed, section 13 of the Annotation clearly distinguishes "passive negligence" in the sense of "secondary negligence" from a landowner's negligent failure to provide a safe place to work for the employees of an independent contractor:

> In some cases involving a contractor's agreement to indemnify the owner with respect to injuries occurring in the course or prosecution of the work, or a similar contractual provision, the courts, without characterizing the negligence as active or passive or discussing that doctrine, have afforded the owner protection, regardless of whether the contractor was negligent, where an employee of the contractor, while engaged in the latter's work, was injured by reason of a pre–existing condition of the owner's premises which was defective or dangerous, or which became dangerous by reason of the nature or doing of the work, and liability attached to the owner on the ground

that he negligently failed to furnish such workman with a safe place to work, or on a similar ground.

*Annot.*, 27 A.L.R.3d § 13 at 734.

The majority's inconsistent use of the terms is further demonstrated by its reliance on *Bartlett v. Davis Corp.*, 219 Kan. 148, 156, 547 P.2d 800, 808 (1976), for the principle that "[w]here the indemnitor has possession and control of the work or premises and the owner does not maintain independent operations on the premises, a contract of indemnity is generally construed to cover passive negligence of the owner." *See* Majority op. at 433 Pa. 327, 249 A.2d 569. In *Bartlett*, the deaths of two boys were caused by the negligent conduct of a landowner and the operator of a sand and gravel pit (who had exclusive possession and control of the work and premises). While the term "passive" was used by the court in *Bartlett* to denote the landowner's negligent failure to comply with a municipal ordinance requiring him to maintain a fence of specified type and dimensions around the pit, and thus may have been used in the same sense as in *Potter Title & Trust Co. v. Young*, it is equally possible that the court wished its use of "passive" to distinguish between the landowner's secondary negligence in causing the boys' deaths from the operator's primary negligence, or indeed, that the court was using the term to convey both meanings simultaneously. A similar observation may be made regarding the majority's citation of *Harvey Machine Co. v. Hatzel & Buehler, Inc.*, 54 Cal.2d 445, 353 P.2d 924, 6 Cal.Rptr. 284 (1960).

In the present case, while the Redevelopment Authority's negligence was "passive" as that term is defined in *Potter Title & Trust Co. v. Young, supra*, it was "active" in the sense that it was the primary legal cause of the death of Noralco's workman.

—3—

The issue raised in this appeal is simply this: When the parties contracted with each other, did they intend that

Noralco should indemnify the Redevelopment Authority for the consequences of its negligent failure to provide Noralco's workmen with a safe workplace? This issue may be decided without resort to the terms "active" and "passive" negligence, as the majority's own opinion demonstrates. For in spite of its extended discussion of the concept of "passive" negligence, the majority does not grant the Redevelopment Authority indemnification because the Authority was merely "passively" negligent, but rather because the parties' contract and the circumstances surrounding its formation, including, *inter alia*, the nature of the respective businesses of the Authority and Noralco, Noralco's exclusive control and possession of the work and premises during its operations thereon, and the nature of the services to be rendered and the amount of the remuneration to be paid, established, clearly and convincingly, that the parties intended that Noralco would indemnify the Authority for injuries suffered by Noralco's workmen because of the Authority's failure to provide them with a safe place to work. Thus the majority's discussions of "active" and "passive" negligence could have been easily avoided, since the parties did not themselves use those terms,[2] and far more precise terminology exists to describe the intentions of the parties.

Today's opinion by the majority can only serve to encourage continued reference to "active" and "passive" negligence in future cases, and thereby encourage unsound thinking, which, in turn may lead to unsound results.

We should have done better to repudiate the terms "active" and "passive," and relegate them to the realm of legal history.

2. See *Leidy v. Deseret Enterprises, Inc.*, 252 Pa.Super. 162, 167 n.2, 381 A.2d 164, 167 n.2 (1977), for an instance where the phrase "acts of active or passive negligence" appeared in the exculpatory clause of a written contract.